## ARGUED AND DETERMINED

### IN THE

# COURT OF APPEALS

### OF

# MARYLAND.

———◆———

NEGRO GEORGE, *et al. vs.* CORSE's Adm'r.—June Term, 1827.

On a petition by certain slaves against the administrator of J C, with the will annexed, in which they claimed freedom, it appeared that J C, whose property they were at the time of his death, had declared them free by his last will and testament, and thereby provided that if his personal estate, exclusive of such slaves, should not be sufficient to discharge all his just debts, then his executor or administrator might sell so much of his real estate as would pay his debts, so as to have his slaves free; that the testator's personal estate, exclusive of the said slaves, would not pay his debts, and that the administrator admitted the testator's real and personal estate, exclusive of the slaves, was sufficient to pay his debts—*Held,* that the petitioners were not entitled to freedom.

APPEAL from *Kent* County Court. The appellants filed their petition, (claiming their freedom,) against the appellee, as administrator with the will annexed of *James Corse.* The appellee pleaded that the petitioners were not entitled to their freedom, and issue was joined.

At the trial the following facts were admitted, viz. That the petitioners were owned and possessed by *James Corse* on the 13th of January 1824, and also at the time of his death, which was in October 1825. That the said *James Corse,* by his last will and testament, duly executed by him, dated the 13th of January 1824, amongst other things therein contained, bequeath-

ed and devised as follows: "*Imprimis.* I hereby set free all my negroes of every description, in the following manner, which is to say; the men *George, David, Jim* and *Harry,* at my death; also the women, to wit, *Maria, Beck* and *Mary,* with their issue, in case they should have issue between this time and that period, my death; and the boys as they severally arrive to the age of twenty-one,—to wit, *Isaac,* eighteen years old, *Levi,* fifteen years old, *Sandy,*" &c. "and the girls at the age of eighteen, with their issue, in case they should have issue, to wit, *Phillis,* fourteen years old, and *Sally,* twelve years old. And it is hereby expressly provided, that if my personal estate, exclusive of the negroes, should not be sufficient to discharge all my just debts, then my will is that my executor or administrator, as the case may be, may sell so much of my real estate as will pay my debts, so as to have my negroes free as before stated." He then devised and bequeathed to his brother *Unit Corse,* and to his heirs and assigns, the residue and remainder of his estate, both real and personal, with the unexpired time of the negro boys and girls, as designated in the first clause of his will; and he appointed his said brother *Unit Corse* his executor. That on the 13th of January 1824, the said *James Corse* owned and possessed under the will of his father, all the lands and real estate, which had been devised to him by his father *James Corse,* deceased. That the will of the said *James Corse,* (the father,) which was duly executed so as to convey real estate, so far as the same relates to the lands devised to his son, the said *James Corse,* is as follows: "*Item.* I give and devise unto my son *James Corse* my home dwelling plantation known by the name of *Wright's Rest* and *Middle Neck,* to him my said son *James Corse,* and to his heirs lawfully begotten of his body, forever. And in order that my said son *James Corse* should have it fully in his power to transmit the home dwelling plantation without injury down to posterity, I therefore, *Item.* I give and devise unto my said son *James Corse* one other plantation known by the name of *Saint Martin's* and *Allebone's Addition,* be the same known by whatever name or names it may, to him my son *James,* and his heirs, forever." That *James Corse,* the devisee, on the 22d of February 1825, conveyed in fee simple to *Thomas Wilson,*

in consideration of the sum of $3,248, "all those parts of tracts or parcels of land lying and being in *Kent* county, called *St. Martin's* and *Allebone's Addition*, which were devised to the said *James Corse* by his father, *James Corse*, deceased, by his will dated the 3d of May 1815, except one acre and thirty-two perches, which was heretofore sold and conveyed by the said *James Corse* to *Philip Crane*, by deed bearing date the 26th of March 1822." That *Thomas Wilson* on the 22d of February 1825, conveyed in fee simple to *Unit Corse* and the said *James Corse*, as tenants in common, in consideration of the sum of $7,108, "all that part of a tract or parcel of land situate, lying, and being, in *Kent* county, called *Cammelsworthmore*, containing 20 acres of land; also all that part of a tract or parcel of land, lying and being in the county aforesaid, called *Ridgely*, containing ten acres, together with the grist-mill and saw-mill thereon." That the said *James Corse*, on the 11th of July 1825, conveyed in fee simple to *Thomas C. Kennard*, in consideration of the sum of ten dollars, "all that farm or plantation of him the said *James Corse*, lying and being in *Kent* county, commonly called *The Home Farm*, being composed of a tract or part of a tract of land, called *Wright's Rest*, and a tract or part of a tract, called *Middle Neck*, which said farm or plantation was devised to the said *James Corse* by his late father, *James Corse*, deceased." That *Thomas C. Kennard* on the 14th of July 1825, reconveyed to the said *James Corse*, and his heirs, in consideration of the sum of ten dollars, the last above mentioned lands, which had been conveyed by the said *Corse* to the said *Kennard*. That the lands conveyed in the deed from *James Corse* to *Thomas Wilson*, were given in exchange for such part of the lands, mills and premises, as were conveyed to the said *Corse* by the deed from *Wilson* to *Unit Corse* and *James Corse*. That the said *James Corse*, the younger, was at the time of his death seized and possessed of an estate in fee simple in and to the lands, called *Wright's Rest*, and *Middle Neck*, which are mentioned in the will of his father as aforesaid; and also in and to an undivided moiety of the lands, mills and premises, mentioned in the deed from *Wilson* to *Unit* and *James Corse*. It was also admitted that the personal estate of the said *James Corse*, either including or ex-

cluding his negroes, was not, at the time of the execution of his said will, and has not at any time since, been sufficient to pay his debts; but that the undivided moiety of the said *James Corse*, in and to the lands and premises mentioned in the deed from *Wilson* to *Unit* and *James Corse*, together with the personal estate of the said *James Corse*, exclusive of his negroes, were at the time of his death, and still are, sufficient to pay all his just debts and funeral expenses.    And also that the above mentioned lands, called *Wright's Rest* and *Middle Neck*, together with the personal estate of the said *Jame Corse*, exclusive of his negroes, were on the 13th of January 1824, and also at the time of the death of the said *Corse*, and still are sufficient to pay all his just debts, and funeral expenses.    That the personal estate of the said *Corse*, including his negroes, was not at the time of the execution of his will, nor has it at any time since been sufficient to pay his debts.    The counsel of the petitioners then prayed the court to instruct the jury, that if they believed the foregoing facts, they must find a verdict for the petitioners.    Which prayer the Court, [*Purnell* and *Wright*, A. J.] refused to give; but did instruct the jury, that if they believed the facts admitted, they must find a verdict for the defendant.    The petitioners excepted; and the verdict and judgment being against them, they appealed to this court,

The cause was argued before EARLE, ARCHER, and DORSEY, J. by

*Eccleston*, for the Appellants; and by
*Chambers*, for the Appellee.

The Judges delivered their opinions *seriatim.*

DORSEY, J.    In forming an opinion on this case, I have been truly sensible of the peculiar hardship of the situation of the petitioners, and have felt, as far as I consistently could do, an anxious disposition to relieve them.   ·But, after mature reflection, I feel convinced, that this court, on the proceedings now before them, is incompetent to grant relief.

Previously to the passage of the act of assembly of 1796, *ch.* 67, the manumission of slaves by last will and testament was prohibited; by the 13th *section* of that act this prohibition was re-

moved; but upon this express condition, that no such manumis-- sion "shall be effectual to give freedom to any slave or slaves, if the same shall be in prejudice of creditors." Whether in case of an insufficiency of the personal estate, (exclusive of the negroes manumitted,) to pay the debts of the deceased, it be deemed a prejudice to creditors, within the meaning of the act of assem-- bly, to subject them to the delay and expense unavoidably in-- curred in pursuing in a court of equity real assets, which have come to the hands of the heir by descent, I deem it unnecessa-- ry to determine. The ground on which I concur in the judg-- ment given by the court below against the petitioners is, that the question of the existence of a sufficiency of real assets to pay the debts of the testator never can be tried on an issue be-- tween the petitioners and the executor or administrator only, without "prejudice" to creditors. It would be an issue to which they are no party, and to protect whose interest nobody appears. As far as relates to the personalty, the executor or administrator is competent to act for all who are concerned; but in trying the facts, whether there be assets by descent in the hands of the heir, and what is the amount thereof, he has no interest either personally or in right of representation. *Vir-- tute officii* he is neither bound to acquire, nor presumed to pos-- sess any knowledge upon the subject. With the title he is un-- acquainted—with the value of the land equally uninformed. Let the proof offered to establish the same be what it may, he comes prepared neither to rebut nor resist it. Sanction the doctrine contended for by the appellants, and if at any period of his life the deceased be shown to have been seized of real property, the issue will be found for the petitioners, although, if proper parties interested were before the court, it could be made appear that he had conveyed away all his right by legal conveyances executed forty years before his death. A most exaggerated estimate of the value of the real assets may be made by ignorant or partial witnesses; yet none, whose inte-- rest it is to do so, have an opportunity of cross-examining them, or disproving their statements The judgment of the court having once given effect to the manumission, on the ground that effects in the hands of the heir should be applied to the payment of the debts, the executor or administrator is absolved

from all responsibility, except as to the residue of the person‑ alty, and the creditors would be left to seek, through a court of equity, real assets, which perhaps never had an existence.   No‑ thing was farther from the design of the legislature, than to have authorised a mode of judicial proceeding so unprecedent‑ ed, and so unjust and prejudicial to creditors.

It may be urged that the case now before us should be an ex‑ ception to the  general rule, inasmuch as the testator has, in the contingency which has  happened, charged his real estate with the payment of his debts; and it is admitted  in the bill of ex‑ ceptions, that the residue of the personal, with the real proper‑ ty, is adequate  to their  payment.    But this suggestion is enti‑ tled to no weight.

In the first  place the testamentary charge of the debts upon the land, was revoked by the deeds of conveyance subsequent‑ ly executed; and  if it had  not been, the effect  would  be the same, as  the existence or value of the  property charged could not be inquired into.    As regards the admissions by the appel‑ lee, he was wholly unauthorised  to make them, and  the court was incompetent to pass judgment upon the facts they contain‑ ed—not being matters in issue in the cause.

I am of  opinion that the  judgment of the county court ought to be affirmed.

ARCHER, J.   Although I concur in the conclusion  to which the judge, who has  just delivered his opinion has arrived, I do not altogether  agree with  his reasoning.    I do not believe the act of 1796, *ch.* 67, *s.* 13, should  be so construed as to prohibit a testator from manumitting his slaves, provided he has left real estate sufficient to  pay his debts.    All a man's estate, real and personal, is a fund  for the  payment of his debts.    The former can  be resorted to with as much facility  in the absence of the latter, as personal property itself can.    To, be sure the personal estate  is the  first fund  to which the creditor is to  look; but I cannot  believe if  by  the  manumission of slaves, the personal estate is made insufficient, and the creditor is compelled to re‑ sort to the real estate for payment of  his debts, that he is there‑ by prejudiced within the meaning of  the act of assembly.    To constitute such a prejudice, in my opinion, some loss should re‑,

sult to him, which could not be the case where the real assets are sufficient.

My difficulty in the present case is that there are no parties to the record who are competent to make the admission, that the real estate is sufficient to pay the debts, when the petitioners are abstracted from the personal property. Surely the executor cannot do it. He has only to deal with the personal estate—with the real estate he has nothing to do, and is an entire stranger to it. He is not in law supposed to know either the title by which it is held or its value; nothing in relation to it coming within the scope of his legal power and authority. Were the admissions of an executor taken, creditors would be utterly insecure; they would be bound by the admissions of one who, from the character of his office, would be irresponsible to them, which would be the extremity of injustice.

Were it possible for the petitioners to ascertain the creditors of the testator, I strongly incline to the opinion that they might in equity be compelled to resort to the real estate for the payment of their debts. Of this, however, I give no decisive opinion, as the case before the court does not demand that I should point out a remedy, but only to determine whether the law furnishes the remedy which is sought; and I am clearly of opinion it does not; for we must be satisfied that the creditors will not sustain a loss, if the petitioners are adjudged to be free, and that we cannot do in these proceedings.

EARLE, J. This is an appeal from a judgment of *Kent* county court. The appellants are petitioners, claiming their freedom under the will of *James Corse*, and the appellee is his administrator, with his will annexed. The verdict is against the petitioners; and it was rendered on an agreed statement of facts, under an instruction given by the associate judges of the court to the jury to find for the defendant. This instruction gave rise to the bill of exceptions, which forms the present subject of inquiry. Ought the court to have instructed the jury to find against the petitioners?

I approach the consideration of this subject with every disposition to favour the pretensions of the appellants, as it appears to have been the earnest wish of their master, protector

and friend, that they should be free; but in deciding on their rights, my inclinations and feelings must not induce me to overlook the interests of others. Their contention is with *Thomas C. Kennard*, who appears in a representative character, and whose security in the performance of his trust, must be consulted. The creditors are the first objects of this trust, to whom his testator was bound to be just, before to others he could be generous. It was not in his power to confine them to a particular fund for the satisfaction of their debts, to whose demands the whole of his estate was equally liable. More particularly was it not with him, to turn them over from the natural fund, to one more uncertain, and less accessible. It is true they might resort to his real assets, agreeably to his wishes, but they had a right to call on his personal estate for payment, to the full extent of it, if they had been pleased so to do. The point then arises, whether a verdict and judgment rendered against this administrator, could have justified him to the creditors, if he had attempted to have established by proof the insufficiency of the real and personal assets, independent of the negroes, to pay the debts of the deceased, and failed in the attempt? The plain answer to the point is, that such a proceeding would not have excused him; because in the trial of such a question, he was not competent to act the part he assumed. With the real assets, and their sufficiency or insufficiency, he had nothing to say, and was in no way cognizant of their value or extent, and had not the means of ascertaining the one or the other. In my opinion, then, he acted the prudent part in avoiding this controversy, and by admitting the fact of sufficiency, very properly brought the question of right before the court, who appears to me to have decided it correctly. It never could have been the intention of the act of 1796, *ch.* 67, to have abrogated principles long established, by compelling creditors to look for payment to a particular fund, specified by their debtor; nor could it have been its design to oblige them to abide by the verdict of a jury, deciding on the question of sufficiency or insufficiency of real assets, where the executor alone was a party, and they not represented in the controversy.

I think the judgment ought to be affirmed.

JUDGMENT AFFIRMED.